UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| A.C.,<br><br>        Plaintiff,<br><br>    v.<br><br>CITY OF SANTA CLARA, et al.,<br><br>        Defendants. | Case No.  13-cv-03276-HSG<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. No. 77 |

## I.    INTRODUCTION

Plaintiff A.C. brings this action against the City of Santa Clara and individual officers Kurt Clarke, Mike Horn, Nathan Crescini, Frank Hagg, Troy Cardin, and Josh Higgins (collectively, "Defendants") under 42 U.S.C. § 1983 and California common law.  Plaintiff asserts six causes of action: (1) use of excessive force; (2) violation of the Bane Act (California Civil Code § 52.1); (3) negligence; (4) intentional infliction of emotional distress; (5) assault and battery; and (6) a *Monell* claim against Santa Clara and Defendant Clarke.  First Amended Complaint ("FAC"), ¶¶ 37-61. Defendants move for summary judgment on all causes of action.  The Court heard oral argument on the motion on July 2, 2015.  Having carefully considered the parties' written and oral arguments, and the entire record, the Court GRANTS in part and DENIES in part Defendant's motion for summary judgment.

## II.   FACTS[1]

The facts below are undisputed, except where noted.  On the evening of July 7, 2012, Plaintiff A.C., who was 16 years old at the time, attended a house party in Santa Clara, California. Declaration of DeWitt M. Lacy (Lacy Decl.) Ex. A, ("A.C. Dep.") at 13:22-16:1, Dkt. No. 82-1.

---

[1] This factual summary assumes all inferences in Plaintiff's favor, as the Court must at the summary judgment stage.

United States District Court
Northern District of California

1   While at the party, Plaintiff and other partygoers, who he contends were also minors, consumed

2   alcohol. *See id.* at 14:1-12; 18:12-19:14. As a result, Plaintiff became intoxicated. *Id.* at 37:8-10;

3   Lacy Decl., Ex. B ("Hauck Dep.") at 28:13-17. In response to neighbors' noise complaints, police

4   officers went on two separate occasions to the residence where the party was being held.

5   Declaration of Kevin Fraser ("Fraser Decl."), Ex. A at SC0039 (Mike Carleton Police Report);

6   A.C. Dep. at 20:11-20; 26:1-23, Dkt. No. 82-1. Plaintiff contends that even though alcohol was

7   visible on the premises when the police arrived the first time, they dispersed the party. A.C. Dep.

8   at 21:16-22:18, Dkt. No. 82-1. In compliance with the officers' orders, Plaintiff and his friend,

9   Sean Litel, left the party, walked across the street, and waited for the officers to leave. *Id.* at

10  22:10-25. Once the officers left, Plaintiff and Litel returned to the home. *Id.* at 24:9-24. A few

11  hours later, the police came to the residence a second time. *Id.* at 26:1-6. Again, Plaintiff and

12  Litel left. *Id.* at 27:1-2. This time, when he and Litel returned, Plaintiff was not allowed back into

13  the home, even though he had anticipated spending the night there. Fraser Decl. Ex. B at SC1386-

14  87; Declaration of Rebecca Widen ("Widen Decl."), Ex. K ("A.C. Dep.") at 36:11-15, Dkt. No.

15  77-8; Widen Decl., Ex. J ("Hauck Dep.") at 18:8-15, 19:7-10, Dkt No.77-8.

16      Forced to leave the party in the early morning hours of July 8, 2012, Plaintiff started

17  walking while intoxicated. A.C. Dep. at 41:14-42:9, Dkt. No. 77-8. As he walked, Plaintiff began

18  to feel suicidal. *Id.* at 36:6-15. He arrived at a fire station near the corner of Homestead Road and

19  Kiely Boulevard. A.C. Dep. at 42:13-43:8, Dkt. No. 82-1. Plaintiff contends that he knocked on

20  the fire station door, but received no response. *Id.* at 43:5-44:11. Seeking help, Plaintiff next

21  called 911. *Id.* at 44:17-19, 48:25-49:2. He told the 911 dispatcher that "Someone is trying to kill

22  himself over here on Kiely and Homestead right now." Fraser Decl., Ex. C ("911 Audio

23  Transcript"). The dispatcher asked how the person was trying to kill himself and Plaintiff

24  responded "with a knife." *Id.* The call terminated, and the 911 dispatcher attempted to return the

25  call but Plaintiff did not respond. *Id.* In response to the 911 call, City of Santa Clara Police

26  Department ("SCPD") officers were dispatched to the intersection of Homestead Road and Kiely

27  Boulevard. *Id.*

28      Officer Paul Garces was the first to arrive at the scene. *See* Lacy Decl., Ex. C at SC0002

2

United States District Court
Northern District of California

1  ("Garces Police Report"), Dkt No. 82-3, Fraser Decl., Ex. A at SC0006 (Horn Police Report).

2  Garces claims that he immediately perceived Plaintiff as a threat.  *Id.*  Plaintiff testified that after

3  Garces got out of his police car, he "put me at gun point."  A.C. Dep. 50:3-17, Dkt. No. 82-1.  At

4  that point, A.C. pulled out his pocketknife and held it to his own throat.  *Id.*  Garces claims that he

5  did not draw his gun until he saw Plaintiff holding a switchblade.  Garces Police Report at

6  SC0002; *see* Lacy Decl., Ex. D. ("Higgins Dep.") at 52:3-10, Dkt. No. 82-4.  Though the parties

7  dispute who drew a weapon first, both agree that Plaintiff held the knife to his own neck.  Plaintiff

8  says he did this because "didn't know what [the police] were going to do."  A.C. Dep. at 49:5-6,

9  Dkt. No. 82-1.  Plaintiff testified that he believed if he held the knife to his neck, the police would

10  not shoot him.  *Id.* at 50:12-17 ("Because why would they shoot someone with a knife towards

11  their neck?").  Garces claims that he tried to talk to A.C. in order to get him to put the knife down,

12  but was unsuccessful.  Garces Police Report at SC0002-03.  Several more SCPD officers,

13  including named defendants Clarke, Horn, Crescini, Higgins, Hagg and Cardin, then arrived.

14  Garces Police Report at SC0003; Fraser Decl., Ex. A at SC006 (Horn Police Report), SC0015

15  (Higgins Police Report), SC0016 (Hagg Police Report), SC0017 (Cardin Police Report); A.C.

16  Dep. at 53:13-17, Dkt. No. 82-1; Lacy Decl., Ex. E ("Crescini Dep.") at 72:15-18; Lacy Decl., Ex.

17  H ("Clarke Dep.") at 53:2-15.  Crescini was accompanied by his police dog partner, a German

18  Shepherd "K-9 officer" named "Jax."  Fraser Decl., Ex. A at SC0020-21 (Crescini Police Report).

19  The officers had their guns drawn and maintained an "L-Shape" formation around Plaintiff.  A.C.

20  Dep. at 53:13-17, 54:20-55:1, Dkt. No. 82-1; Higgins Dep. at 66:23-67:4, 68:17-22; Crescini Dep.

21  at 72:22-73:13, Dkt. No. 82-5.

22      During this time, Higgins believed Plaintiff was intoxicated.  Higgins Dep. at 57:1-11.

23  Higgins observed that A.C.'s eyes were red and watery, and that he was sweaty, pale, breathing

24  heavily, and swaying side-to-side, even as he stood in place.  *Id.* at 57:1-11, 61:3-14.  A.C. was

25  non-responsive to the officers' repeated requests that he drop the knife.  *Id.* at 50:4-20; 58:13-15;

26  A.C. Dep. at 58:1-7, Dkt. No. 108; Fraser Decl., Ex. A at SC0015 (Higgins Police Report); Garces

27  Police Report at SC0003; Fraser Decl., Ex. A at SC0008 (Horn Police Report); Fraser Decl., Ex. A

28  at SC0011 (Nelson Police Report).  Instead of dropping the knife, Plaintiff started to retreat.  A.C.

1  Dep. at 53:13-20, 58:21-59:5, Dkt. No. 82-1.  As he did so, the officers followed him.  Higgins

2  Dep. at 60:19-61:2, 62:9-15.  It is undisputed that throughout this encounter at least some of the

3  officers had their guns drawn and pointed towards Plaintiff.

4  By the time Plaintiff started to retreat, there were approximately ten to twelve police

5  officers on the scene.  Crescini Dep. at 72:15-18.  One of them, Officer Horn, was a member of the

6  SCPD's "Special Response Team," and had specialized training in dealing with "high risk

7  situations involving armed suspects."  Fraser Decl., Ex. A at SC0007 (Horn Police Report).  Horn

8  requested that a SAGE device be delivered to the scene.  *Id.*  A SAGE device is a launcher that

9  fires rubber projectiles.  Ex. A at SC0007 (Horn Police Report).  It is described as a "less-lethal"

10  force option when officers need to obtain the compliance of an armed suspect from a distance.  *Id.*

11  Horn wrote in his police report that he believed using the SAGE device was "the most reasonable

12  less lethal option" available to the officers, if "peaceful negotiations failed."  *Id.*

13  Sergeant Lopez, a member of the SCPD hostage negotiations team, delivered the SAGE

14  device.  *Id.* at SC0008.  Lopez began preparing it for use when Officer Clark directed him to assist

15  Officers Nelson and Pilger, who were negotiating with Plaintiff.  *Id.* at SC0008.  Lopez spoke with

16  Nelson and Pilger, but it does not appear that he spoke with Plaintiff directly.  *See* Fraser Decl.,

17  Ex. A at SC0033-34 (Lopez Police Report).  According to officers, by the time Lopez arrived with

18  the SAGE device Plaintiff had moved approximately eighteen feet away from a residential

19  apartment complex.  Fraser Decl., Ex. A at SC0008 (Horn Police Report).  Without citing specific

20  evidence, Plaintiff's opposition brief states that he was a "significant distance" from the driveway.

21  Opp. at 4; Lacy Decl., Ex. K.  At least one officer, Officer Schneider, described A.C.'s movements

22  towards the apartment complex as consistent with an attempt to escape.  Fraser Decl., Ex. A at

23  SC0018 (Schneider Police Report).  Schneider said he feared if Plaintiff "was given enough time

24  to plan an escape, the lives of innocent bystanders would be at stake."  *Id.*  Similarly, Officer Horn

25  cited concern for the safety of innocent persons in Plaintiff's vicinity as the reason the officers

26  blocked traffic on Kiely Boulevard and Homestead Road near the apartment complex.  *Id.* at

27  SC0007 (Horn Police Report).

28  The officers continued to order Plaintiff to drop the knife, but he did not comply.  Fraser

United States District Court
Northern District of California

4

United States District Court
Northern District of California

Decl., Ex. A at SC0008 (Horn Police Report); A.C. Dep. at 49:1-9, 58:1-7; 60:14-22, Dkt. Nos. 82-1, 108; Crescini Dep. at 62:10-17; Lacy Decl., Ex. I ("Horn Dep.") at 97:18-98:4, 102:5-8, Dkt. No. 83-1.  Plaintiff says that he did not trust the officers and asked them why a rifle (the SAGE device) was pointed at him, and why a K-9 was present.  A.C. Dep. at 59:9-60:11, Dkt. No. 82-1; *see also* Crescini Dep. at 61:23-62:6.  Plaintiff does not recall if the officers responded to his questions.  A.C. Dep. at 59:25-60:11.  At this time, Defendants contend (and Plaintiff does not dispute) that he was approximately 35 feet from Horn, who had the SAGE device pointed at him, and Crescini and the K-9 officer, Jax, who were standing next to Horn.  Opp. at 13; Horn Dep. at 92:1-25; 95:8-10; A.C. Dep. at 59:11-24.  Horn claims that at this point Plaintiff took one to two "wide and aggressive steps" towards the officers.  Fraser Decl., Ex. A at SC0008 (plaintiff took two "aggressive steps"); Horn Dep. at 97:7-2 ("It was really one aggressive step, before I changed what I was doing.").  *Id.*  As he took this step or steps, Horn claims Plaintiff shouted "Come on then!" in a threatening manner.  Fraser Decl., Ex. A at SC0008.  Horn testified that as a result of Plaintiff's alleged actions, he believed Plaintiff intended to attack him or another officer, or was attempting to invoke "suicide by cop."  Fraser Decl., Ex. A at SC0006 (Horn Police Report); Horn Dep. at 97:4-98:20.

Plaintiff says he did not move toward the officers, and the Court must accept this fact as true on summary judgment.  A.C. Dep. at 61:7-21, 61:25-62:2, Dkt. 108.[2]  Plaintiff also denies any intent to harm others or to commit "suicide by cop" when he encountered the officers.  *Id.* at 55:14-16, Dkt. No. 82-1.  Plaintiff does not deny (or admit) saying "Come on then!"

Before firing the SAGE device, Horn shouted "SAGE!" to indicate to his fellow officers that he was going to fire a non-lethal round.  Fraser Decl., Ex. A at SC0006.  Horn did not warn

---

[2] For some reason, Plaintiff's counsel failed to include Plaintiff's deposition testimony on the obviously critical question of whether he took a step toward the officers before being shot with the SAGE device.  The Court can think of no reasonable explanation for this highly significant omission.  On September 11, 2015, the Court ordered Defendants to file the full transcript of Plaintiff's deposition, and they did.  Dkt. Nos. 107 and 108.  Defendants object to the Court considering any evidence Plaintiff's counsel did not submit with its summary judgment filings.  Dkt. No. 110.  Only this fact and Plaintiff's explicit admission that he did not put his knife down in response to the officers' commands to do so fall into that category, and with respect to these facts Defendants' objection is OVERRULED.

United States District Court
Northern District of California

1  Plaintiff that he was going to shoot him with the SAGE device, nor did any of the officers tell him

2  that he was not allowed to take steps. Horn Dep. at 97:16-17, 123:2-1. Immediately after

3  announcing "SAGE!," Horn aimed and shot Plaintiff in the right thigh. *Id.* at 98:15-25. This

4  caused Plaintiff to bend over and touch his right thigh. *Id.* at 103:12-104:4. Seconds later, Horn

5  shot a second projectile from the SAGE device, this time hitting Plaintiff in the head and causing

6  him to collapse backward on the ground.  Horn Dep. at 103:12-104:4; Crescini Dep. at 77:18-

7  78:15; Lacy Decl., Ex. J ("Hagg Dep.") at 51:1-53:9; Lacy Decl., Ex. G. ("Cardin Dep.") at 39:12-

8  40:15.

9       Within seconds, without knowing whether Plaintiff had dropped his knife, Crescini

10  released his K-9 partner, Jax. Crescini Dep. at 80:1-81:14. Under Crescini's direction, Jax

11  attacked Plaintiff, biting him in the left rib area multiple times. *Id.* at 39:12-40:15. Plaintiff did

12  not react to the K-9 attack and appeared to be unconscious. Horn Dep. 104:21-23; Hagg Dep. at

13  56:6-10.

14       After the K-9 attack, Crescini, Hagg, and Cardin ran over to Plaintiff, stepped on his arms

15  and legs and handcuffed him. Hagg Dep. 56:11-20; Higgins Dep. 85:5-22, 91:6-17; Cardin Dep.

16  41:17-44:25.

17       Plaintiff was transported to Santa Clara Valley Medical Center where he immediately

18  underwent emergency brain surgery. Fraser Decl., Ex. A at SC0009 (Horn Police Report); Fraser

19  Decl., Ex. A at SC0012 (Morgan Police Report). As a result of this incident, Plaintiff suffered a

20  fractured skull, and brain trauma. Lacy Decl., Ex. F (A.C. Hospital Record); Fraser Decl., Ex. A

21  at SC0012 (Morgan Police Report). Plaintiff and Plaintiff's father assert that these injuries have

22  resulted in lasting medical issues for him, including chronic headaches, memory loss, an inability

23  to retain new information, extreme emotional sensitivity, and various scars and scratches. A.C.

24  Dep. at 66:6-12, 67:20-23, 67:9-17, Dkt. No. 82-1; Lacy Decl., Ex. M ("M. Calhoun Dep.") at

25  80:17-81:2, 91:24-92:5; 101:1-9.

26  **III.   SUMMARY JUDGMENT STANDARD**

27       Under Federal Rule of Civil Procedure 56(a), "the court shall grant summary judgment if

28  the movant shows that there is no genuine dispute as to any material fact and the movant is

6

United States District Court
Northern District of California

1    entitled to judgment as a matter of law."  Only genuine disputes over material facts will preclude

2    summary judgment; "factual disputes that are irrelevant or unnecessary will not be counted."

3    *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Material facts are those that may

4    affect the outcome of the case.  A dispute as to a material fact is "genuine" if the evidence is such

5    that "a reasonable jury could return a verdict for the nonmoving party."  *Id.*  "[I]n ruling on a

6    motion for summary judgment, the judge must view the evidence presented through the prism of

7    the substantive evidentiary burden."  *Id.* at 254.  The question is "whether a jury could reasonably

8    find either that the [moving party] proved his case by the quality and quantity of evidence required

9    by the governing law or that he did not."  *Id.*  "[A]ll justifiable inferences must be drawn in [the

10   nonmovant's] favor."  *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1542

11   (9th Cir. 1989) (en banc) (citation omitted).  This is true where the underlying facts are undisputed

12   as well as where they are in controversy.  *Eastman Kodak Co. v. Image Technical Services, Inc.*,

13   504 U.S. 541 (1992); *McSherry v. City of Long Beach*, 584 F.3d 1129, 1135 (9th Cir. 2009).

14   The moving party must inform the district court of the basis for its motion and identify those

15   portions of the pleadings, depositions, interrogatory answers, admissions and affidavits, if any,

16   that it contends demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v.

17   Catrett*, 477 U.S. 317, 323 (1986).  A party opposing a motion for summary judgment "may not

18   rest upon the mere allegations or denials of [that] party's pleading, but . . . must set forth specific

19   facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e); *see also Liberty Lobby*,

20   477 U.S. at 250.  The opposing party need not show the issue will be resolved conclusively in its

21   favor.  *Liberty Lobby*, 577 U.S. at 248-49.  All that is necessary is submission of sufficient

22   evidence to create a material factual dispute, thereby requiring a jury or judge to resolve the

23   parties' differing versions at trial.  *Id.*

24

25

26

27

28

United States District Court
Northern District of California

**IV.    DISCUSSION**

**A.    Fourth Amendment Claims[3]**

Plaintiff asserts that the officers violated his Fourth Amendment rights by using excessive force when (1) Horn shot two rubber projectiles at Plaintiff from the SAGE device striking plaintiff in the head and the right leg; (2) Crescini released his police dog on Plaintiff after he had been hit with the rubber projectiles; and (3) Cardin, Higgins, Crescini and Hagg arrested Plaintiff. Opp. at 14-16.  Defendants respond that (1) the undisputed facts establish that the amount of force used was objectively reasonable as a matter of law in light of the particular circumstances facing the officers; and (2) all of the officers are entitled to qualified immunity even if a constitutional violation occurred.  Mot. at 12-13.

**1.    Substantive Legal Standard**

The Fourth Amendment guarantees citizens the right to be secure in their persons against unreasonable seizures.  *Graham v. Connor*, 490 U.S. 386, 394 (U.S. 1989).  In determining whether an officer's conduct violates the Fourth Amendment, courts look to the reasonableness of the accused officer's use of force.  *Id.*  Law enforcement officers are authorized to use "objectively reasonable force" in order to make a lawful arrest or detention.  *Id.* at 397.  "Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake."  *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011).   Whether officers used reasonable force depends on the facts and circumstances of the particular case.  *C.B. v. Sonora*, 769 F.3d 1005, 1029 (9th Cir. 2014).  The Court judges the "reasonableness of the use of force from the perspective of a reasonable officer at the scene."  *Sandoval v. Las Vegas Metropolitan Police Dept.*, 756 F.3d 1154, 1166 (9th Cir.

_____

[3] Plaintiff also asserts a violation of his Fourteenth Amendment rights based on excessive force. However, the Supreme Court has held that "all claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other seizure of a free citizen should be analyzed under the Fourth Amendment and its reasonableness standard, rather than under a substantive due process approach" under the Fourteenth Amendment.  *Graham v. Connor*, 490 U.S. 386, 395 (U.S. 1989).  For this reason the Court analyzes Plaintiff's excessive force claims under the Fourth Amendment's "reasonableness" standard.

United States District Court
Northern District of California

2014).  In assessing whether an officer's use of force violated the Fourth Amendment, courts are counseled to "allow for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Jackson v. City of Bremerton*, 268 F.3d 646, 651 (9th Cir. 2001) (citation and internal quotation marks omitted).  Thus, the Court must balance the force used against the need, to determine whether the force used was "greater than is reasonable under the circumstances." *Santos v. Gates*, 287 F.3d 846, 854 (9th Cir. 2002).

### 2.  Qualified Immunity Legal Standard

Qualified immunity is an entitlement, provided to government officials in the exercise of their duties, not to stand trial or face the other burdens of litigation.  *Saucier v. Katz*, 533 U.S. 194, 200 (2001).  The doctrine of qualified immunity attempts to balance two important and sometimes competing interests — "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2015) (internal quotation marks and citation omitted).   The doctrine thus intends to take into account the real–world demands on officials such as police officers in order to allow them to act "swiftly and firmly" in situations where the rules governing their actions are often "voluminous, ambiguous, and contradictory." *Mueller v. Auker*, 576 F.3d 979, 993 (9th Cir. 2009).  "The purpose of this doctrine is to recognize that holding officials liable for reasonable mistakes might unnecessarily paralyze their ability to make difficult decisions in challenging situations, thus disrupting the effective performance of their public duties." *Id.*

To determine whether an officer is entitled to qualified immunity, the Court must consider whether (1) the officer's conduct violated a constitutional right, and (2) that right was clearly established at the time of the incident.  *Pearson*, 555 U.S. at 232.  Courts are not required to address the two qualified immunity issues in any particular order, and instead may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 243.

With respect to the second prong of the qualified immunity analysis, the Supreme Court

has recently held that "[a]n officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in his shoes would have understood that he was violating it, meaning that existing precedent . . . placed the statutory or constitutional question beyond debate." *City & Cnty. of San Francisco, Calif. v. Sheehan,* ---U.S.---, 135 S. Ct. 1765, 1774 (2015) (citation and internal quotation marks omitted).  This is an "exacting standard" which "gives government officials breathing room to make reasonable but mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Id.* (citation and internal quotation marks omitted).  In conducting this analysis, the Court must determine whether the pre-existing law provided defendants with "fair notice" that their conduct was unlawful.  *Sheehan,* 135 S.Ct. at 1777.

In deciding if a triable issue of fact exists regarding whether Defendants are entitled to qualified immunity, the Court thus considers (1) the state of the law at the time of the alleged violation, (2) the information possessed by the officers at the time they utilized force, and (3) the officers' actions, viewed in the light most favorable to plaintiff.  *Tolan v. Cotton*, 134 S.Ct. 1861, 1866-68 (2014).

### 3. Officer Horn is Entitled to Qualified Immunity, Because the Law in 2012 Did Not Clearly Establish that His Actions Were Necessarily Illegal

Plaintiff contends that Officer Horn's firing of rubber projectiles from the SAGE device amounted to excessive force in violation of his Fourth Amendment rights.  FAC ¶ 37-39; Opp. at 14.  For purposes of the qualified immunity analysis, the Court finds it unnecessary to assess the constitutionality of Horn's use of force.  Rather, the Court turns to the second prong of the *Saucier* test first and considers whether, based on the facts known to Horn at the time he fired two shots from the SAGE device, any reasonable officer would have been on notice that using this amount of force in this manner was unlawful under clearly established law.  Based on the state of the law in July of 2012, the Court cannot conclude that Horn's use of the SAGE device, viewing all facts in the light most favorable to Plaintiff, violated clearly established law.

The Supreme Court instructs lower courts considering whether the law was clearly established to determine whether "a consensus of cases of persuasive authority [existed] such that

a reasonable officer could not have believed that his actions were lawful." *Wilson v. Layne*, 526 U.S. 603, 617 (1999); *Ashcroft v. al-Kidd*, 563 U.S. 731, 131 S. Ct. 2074, 2084 (2011).  Here, the state of the relevant law in 2012 regarding the use of less-lethal force weapons like the SAGE device was mixed, with courts coming to different conclusions based on an analysis of highly fact-dependent factors.  Additionally, some cases approved even the use of deadly force under circumstances similar to the undisputed facts here.  Given these divergent results, the Court cannot conclude that any reasonable official acting as Horn did "would have understood that he was violating [clearly established law]," or that "existing precedent . . . placed the statutory or constitutional question beyond debate."  *Sheehan*, 135 S.Ct. at 1774.

For example, in *Blanford v. Sacramento*, the Ninth Circuit held that an officer's use of deadly force against a "deranged" and unresponsive suspect who refused to drop a saber in response to the officers' clear commands was not objectively unreasonable.  *Blanford*, 406 F.3d 1110, 1118-19 (9th Cir. 2005).  In *Blanford*, officers fatally shot a suspect who "was armed with a dangerous weapon, was told to stop and drop it, was warned that he would be shot if he didn't comply, appeared to flaunt the deputies' commands by raising the sword and grunting, refused to let go of the sword, and was intent on trying to get inside a private residence or its backyard with the sword in hand."  *Id.* at 1119.  The *Blanford* court also found that the officers were entitled to qualified immunity.  *Id*.

Other cases decided before 2012 found, based on a detailed analysis of the facts in those cases, that use of less-than-lethal force was unconstitutional.   Plaintiff cites the Ninth Circuit's decision in *Deorle v. Rutherford*, 272 F.3d 1272 (9th Cir. 2001), for the principle that "the Ninth Circuit has long held that officers are not entitled to qualified immunity when use of [a non-lethal device] that strikes an apparently emotionally disturbed subject in the head . . . causing [sic] grievous injuries."  Opp. at 15.  The Court does not read *Deorle* so broadly.  While precedent need not be factually identical to preclude qualified immunity, the key facts in *Deorle* differ from those in this case in at least three critical ways:  (1) the plaintiff there was unarmed; (2) he had complied with officers' commands to drop his weapon; and (3) he was on his own property.  272 F.3d at 1282.

United States District Court
Northern District of California

*Glenn v. Washington County*, 673 F.3d 864 (9th Cir. 2011), is more closely on point.  In *Glenn*, the Ninth Circuit found that disputed factual issues precluded entry of summary judgment for defendant police officers.  In *Glenn*, officers shot a suspect with a beanbag shotgun, then almost immediately fatally shot him with handguns.  673 F.3d at 866.  The court found that issues of fact existed as to whether the defendants' use of the beanbag shotgun was reasonable, notwithstanding (1) the presence of an intoxicated, apparently suicidal suspect who was holding a three-inch pocketknife to his own neck; and (2) the suspect's refusal to drop the knife in the three minutes before he was shot with the beanbag rounds.  *Id.* at 871-875.  On the other hand, in *Glenn*, the officers knew that the suspect "was the teenage son of the homeowners rather than an intruder or criminal," and he "showed no signs of attempting to move until after he was fired upon [with the beanbag rounds].  *Id.* at 873-874.

In this case, without dispute, the confrontation occurred in a public area at least somewhat near the driveway to an apartment complex and an occupied gas station.  Fraser Decl., Ex. A at SC0007-08 (Horn Police Report); Lacy Decl., Ex. K.  A.C. did not drop his knife after being repeatedly told to do so, and instead started to retreat when officers tried to talk to him.  A.C. Dep. at 49:5-6, 50:4-20, 53:13-20, 58:1-15, 59:1-5, Dkt. Nos. 82-1, 108; Fraser Decl., Ex. A at SC0015 (Higgins Police Report); Garces Police Report at SC0003; Fraser Decl., Ex. A at SC0008 (Horn Police Report); Fraser Decl., Ex. A at SC0011 (Nelson Police Report).  Horn fired the SAGE rounds from a distance of around 35 feet.  Horn Dep. at 95:8-10; A.C. Dep. at 61:7-21, 61:25-62:2; Fraser Decl. Ex. A at SC0009 (Horn Police Report).

Given the specific facts and circumstances presented to Horn when he fired the SAGE device, and the mixed holdings of cases involving the use of force in similar situations, the Court finds that in 2012 "a consensus of cases of persuasive authority" did not exist such that a reasonable officer in Horn's position "could not have believed that his actions were lawful." *Wilson,* 526 U.S. at 617.  As a result, the Court finds that Horn is entitled to qualified immunity on Plaintiff's Fourth Amendment claims and GRANTS summary judgment on Plaintiff's First Cause of Action as to him.

United States District Court
Northern District of California

United States District Court
Northern District of California

### 4.    Officer Crescini

#### a.    Disputed Issues of Fact Exist as to Whether Crescini Violated Plaintiff's Constitutional Rights

Defendants contend that Crescini is also entitled to qualified immunity.  On this question, the Court finds it appropriate to address the first prong of the *Saucier* test, and consider whether the facts viewed in the light most favorable to Plaintiff establish a potential constitutional violation.

In determining whether Crescini violated Plaintiff's constitutional rights, the Court must determine whether the use of force was "objectively reasonable under the circumstances." *Graham,* 490 U.S. at 396.  This requires balancing the "nature and quality of the intrusion" on Plaintiff's liberty with the "countervailing governmental interests at stake." *Id.*  In assessing the objective reasonableness of Crescini's actions the Court examines "[1] the severity of the crime at issue, [2] whether the suspect pose[d] an immediate threat to the safety of the officers or others, and [3] whether he [was] actively resisting arrest or attempting to evade arrest by flight." *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005) (quoting *Graham*, 490 U.S. at 396).  "Because the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application," the Court must consider the totality of the circumstances confronting Crescini at the time he released the police dog.  *See id.*

Applying these standards, and resolving all factual disputes in Plaintiff's favor, the Court finds that there are disputed issues of material fact as to whether Crescini violated Plaintiff's Fourth Amendment rights.  First, with regard to the severity of the crime at issue, the undisputed facts reflect that, at most, Defendants suspected that Plaintiff was resisting arrest and was intoxicated in public, and no Defendant points to any evidence that he was committing a more serious crime.  Second, with regard to whether Plaintiff posed an immediate threat at the time Crescini released the dog, a reasonable jury could find that no immediate threat existed.  Even before he was shot by the SAGE projectile, Plaintiff was holding the knife to his own throat, and did not point it at anyone else.  A.C. Dep. at 49:5-6, Dkt. No. 82-1; Garces Police Report at SC0001; Higgins Dep. at 52:3-10, Dkt. No. 82-4; Fraser Decl., Ex. A at SC0010 (Pilger Police Report), SC0011 (Nelson Police Report), SC0017 (Cardin Police Report).  Plaintiff did not move

toward the officers, and was 35 feet away from them.  Horn Dep. at 95:8-10; A.C. Dep. at 61:7-21, 61:25-62:2, Dkt. No. 108.  By the time Crescini released the dog, Plaintiff was slumped motionless on the ground, and some officers testified that Plaintiff was unconscious at that point.  Horn Dep. 104:21-23; Hagg Dep. at 56:6-10.  And Crescini himself acknowledged that he did not know whether Plaintiff was still holding the knife when he released the dog.  Crescini Dep. at 80:1-81:14.  Viewing the record as a whole and making all inferences in Plaintiff's favor, a reasonable trier of fact could conclude that releasing a German Shepherd on Plaintiff after he had been shot in the head with the SAGE round constituted excessive force under the totality of the circumstances.  The facts may come in differently at trial, but at the summary judgment stage the Court cannot conclude that Crescini's use of force was "objectively reasonable" under the Fourth Amendment as a matter of law.

**b.    Disputed Issues of Fact Exist as to Whether Crescini's Conduct Violated Clearly Established Law**

Turning to *Saucier's* second prong, the Court also finds that disputed issues of material fact exist as to whether Crescini's actions violated clearly established law, precluding a grant of qualified immunity at this stage.

Where police officers use a trained police dog, the level of force to be used, whether intermediate or deadly, is determined based upon the unique factual circumstances of the case. *Smith*, 394 F.3d at 701-704 (reversing grant of summary judgment on excessive force issue where police used dog to attack a suspect).  The Ninth Circuit has held on multiple occasions that siccing a dog on a suspect who is subdued or otherwise non-threatening can constitute excessive force. *Mendoza v. Block*, 27 F.3d 1357, 1362 (9th Cir.1994) ("[N]o particularized case law is necessary for a deputy to know that excessive force has been used when a deputy sics a canine on a handcuffed arrestee who has fully surrendered and is completely under control."); *Chew v. Gates,* 27 F.3d 1432, 1471 (9th Cir. 1994) (disputed issues of fact precluded grant of qualified immunity where police officers released a K-9 in response to a hiding defendant who did not appear violent); *Rogers v. City of Kennewick*, 205 F. App'x 491, 493 (9th Cir. 2006) (upholding denial of qualified immunity where officers released a dog without warning to bite and hold a subject who was not

1   dangerous, and where allegations that the suspect was fleeing were debatable).  These cases form a

2   consensus of persuasive authority indicating that, at a minimum, when a suspect is subdued and

3   not dangerous, using a police dog to attack the suspect may violate the Constitution.

4      In light of the evidence that suggests that Plaintiff was unconscious, was not attempting to

5   escape, and posed no threat to himself or others at the time when Crescini released Jax, the Court

6   finds that a jury must determine the facts before a decision on Crescini's entitlement to qualified

7   immunity can be made.  *See Smith*, 394 F.3d at 701, 703. For these reasons, the Court DENIES

8   Defendants' motion for summary judgment as it relates to Crescini's deployment of the police

9   dog.

### 5. Officers Cardin, Hagg, Higgins and Crescini are Entitled to Summary Judgment on Plaintiff's Claim That He Was "Beaten" While Being Arrested, Because Plaintiff Fails to Point to Any Facts Which Could Support a Finding of Liability

12      Finally, the Court addresses Plaintiff's allegation that Officers Cardin, Hagg, Higgins and

13   Crescini used excessive force in arresting him.  In his Amended Complaint, Plaintiff contends that

14   Crescini, Hagg and Cardin, "stepped on [his] arms and legs and handcuffed him."  FAC ¶ 27.  In

15   his Opposition to the instant motion, Plaintiff asserts, for the first time, that Hagg, Cardin, and

16   Higgins beat him.  Opp. at 16.  Plaintiff cannot overcome summary judgment as to this newly-

17   minted theory.  First, Plaintiff never asserted a cause of action for any alleged "beating" by any of

18   the officers.  Second, Plaintiff has produced no evidence to suggest that any such beating occurred,

19   or that Cardin, Hagg, or Higgins used unreasonable force in arresting him.  In his opposition,

20   Plaintiff refers to a photograph allegedly depicting an unexplained wound around Plaintiff's left

21   eye which he attributes to one or more of the officers' actions.  Opp. at 16; Lacy Decl., Ex. L, Dkt.

22   No. 83-4.  However, the photograph does not depict an eye, but instead appears to show an arm.

23   Lacy Decl., Ex. L.  Plaintiff has provided no other evidence to suggest Cardin, Hagg, or Higgins

24   exercised excessive force when arresting him.  On summary judgment, plaintiff is required to put

25   forth "specific facts" showing that there is a genuine issue for trial.  *Liberty Lobby*, 477 U.S. at

26   250.  Taking all inferences in Plaintiff's favor, he has put forth no evidence that could support a

27   non-speculative finding of liability with respect to Cardin, Hagg, Higgins and Crescini on this

1   claim.  As a result, the Court GRANTS Defendant's motion for summary judgment on Plaintiff's

2   Fourth Amendment claims against Cardin, Hagg and Higgins, and further GRANTS summary

3   judgment for Crescini with regard to this issue only.

      **B.**   ***Monell* Claims**

4

5        In addition to his claims against the individual officers, Plaintiff asserts *Monell* claims

6   against Santa Clara and Clarke for maintaining official policies or customs which Plaintiff alleges

7   led to his injuries.  FAC ¶ 40-46; Opp. at 17. [4]  In order to establish *Monell* liability, Plaintiff must

8   show that (1) he possessed a constitutional right of which he was deprived, (2) the city had a

9   policy, (3) the policy amounts to "deliberate indifference" to plaintiff's constitutional rights, and

10  (4) the policy is the "moving force behind the constitutional violation."  *Anderson v. Warner*, 451

11  F.3d 1063, 1070 (9th Cir. 2005).  Failure to train or supervise can give rise to a "policy or custom"

12  sufficient to impose liability on Defendants.  *City of Canton v. Harris*, 489 U.S. 378, 389-90

13  (1991).  However, "[t]he inadequacy of police training may serve as the basis for § 1983 liability

14  only where the failure to train amounts to deliberate indifference to the rights of persons with

15  whom the police come into contact."  *Flores v. Cnty. of Los Angeles*, 758 F.3d 1154, 1158 (9th

16  Cir. 2014) (internal citations omitted).

17       "[D]eliberate indifference is a stringent standard of fault, requiring proof that a municipal

18  actor disregarded a known or obvious consequence of his action."  *Connick v. Thompson,* 131 S.

19  Ct. 1350, 1360 (2011).  In order to defeat summary judgment on *Monell* claims, typically a

20  plaintiff must show a "pattern of similar constitutional violations by untrained employees . . . to

21  demonstrate deliberate indifference for purposes of failure to train."  *Id.*

22       Plaintiff claims that because the officers "openly violated" the City's policies regarding

23  when to deploy police dogs and how to deal with intoxicated minors, *Monell* liability is

24

25  ────────────────

  [4] In support of his *Monell* claims, Plaintiff offers an unsworn report prepared by his police

26  practices expert, Ernest Burwell.  Lacy Decl., Ex. N.  "Unsworn expert reports prepared in
    compliance with Rule 26(a)(2) do not qualify as affidavits or otherwise admissible evidence for

27  purpose of Rule 56, and may be disregarded by the court when ruling on a motion for summary
    judgment."  *See Smith v. City of Oakland*, No. C 05 4045 EMC, 2007 WL 2288328, at *4 (N.D.

28  Cal. Aug. 9, 2007).  The Court has not relied on Plaintiff's expert report, and ORDERS it stricken
    from the record.

United States District Court
Northern District of California

United States District Court
Northern District of California

established.  Additionally, Plaintiff claims that because the City "did not have a policy" on how to deal with mentally impaired subjects, the City of Santa Clara is liable for Plaintiff's injuries.

### 1.  Police Dog Deployment Policy

SCPD General Order 41.8 allows for the use of a K-9 officer in apprehending subjects where the handler believes "the individual has committed or threatened to commit any serious offense" *and* one of the following conditions exist: (1) there is a reasonable belief that the individual poses an immediate threat of violence to officers, the handler, or the public; (2) the individual is physically resisting or threatening to resist arrest; or (3) the individual is believed to be concealed in an area where entry by officers without use of the dog could endanger the officers. Fraser Decl., Ex. G ("Gen. Order 41.8"), Dkt. No. 77-7.  Plaintiff points to the deployment of Jax in this case and in a single previous matter involving an unarmed subject as proof of the City's failure to adequately train and supervise its officers.  But standing alone, two isolated incidents by the same officer are insufficient, as a matter of law, to amount to a pattern reflecting a failure to train. *See Flores*, 758 F.3d at 1159 (dismissing complaint where isolated incidents by two deputies were not sufficient to support a *Monell* claim).

Additionally, Plaintiff argues that the SCPD's failure to reprimand Crescini for violating Department Policy 41.8 is evidence of "repeated constitutional violations for which errant municipal officers were not discharged or reprimanded."  Opp. at 18.  But Plaintiff produces no evidence of "repeated violations," and even assuming (without deciding) that one violation occurred, "a single failure to discipline" officers, by itself, does not give rise to municipal liability under *Monell*.  *Merritt v. Cnty. of Los Angeles,* 875 F.2d 765, 770 (9th Cir. 1989).

### 2.  Policy Regarding Intoxicated Minors

Plaintiff's *Monell* claims regarding SCPD policies for "dealing with intoxicated minors" must also fail, because Plaintiff has not produced any evidence that could support a verdict in his favor.  Essentially, Plaintiff argues without proof that SCPD officers observed intoxicated minors, and dispersed the party.  Opp. at 2; A.C. Dep. at 21:16-22:18, Dkt No. 82-1.  Plaintiff does not even seriously attempt to detail the purported policy at issue, or to show how a violation by any of the Defendants caused his injury, and this claim must be dismissed.

United States District Court
Northern District of California

### 3.  Lack of Policy Regarding Mentally Impaired Subjects

Plaintiff bases his final attempt to establish *Monell* liability on the argument that Santa Clara does not "properly train its officers on how to deal with apparently emotionally disturbed or mentally impaired subjects" or have a policy concerning this issue.  Opp. at 17.  He further argues that officers were not required to take "Crisis Intervention Training" ("CIT").  Plaintiff has produced no evidence suggesting that the City does not in fact have such policies.  In addition, while Plaintiff argues that not all officers were required to take CIT, Defendants submit pages of officer training records showing that both Horn and Crescini *did* receive CIT training.  Fraser Decl., Ex. H.  Moreover, Plaintiff again entirely fails to link his injuries to the alleged lack of a mental health policy or to flaws in the execution of that policy, as required by *Monell*.

Because Plaintiff completely fails to satisfy his evidentiary burden with respect to any of his *Monell* claims, the Court finds that Defendants are entitled to summary judgment on Plaintiff's Second Cause of Action.

### C.   California Common Law Claims

#### 1.   Negligence

Plaintiff asserts a California state law negligence claim against Horn, Crescini, Higgins, Haag, and Cardin arising out of what Plaintiff calls the officers' "duty to ensure the safety of intoxicated minors, including Plaintiff when they ordered the minors to disperse in the middle of the night." FAC ¶¶ 51-55.  But Plaintiff has not put any facts into evidence that suggest any of these officers were present at the party.  In an attempt to save the claim, Plaintiff argues in his Opposition that the City is liable on a theory of respondeat superior for the officer's actions.  Opp. at 21.  But the City is not a named Defendant in Plaintiff's Fourth Cause of Action, and Plaintiff presents no evidence that the officers who broke up the party were members of the SCPD at all.

Alternately, Plaintiff contends that Defendants' overall lack of due care in their direct interaction with him establishes negligence.  Plaintiff never pled that theory.  Instead, he alleged that the duty of care breached was the duty owed to "intoxicated minors" when Defendants "ordered them to disburse [sic]." FAC ¶ 53.  Plaintiff has failed to produce any evidence showing a material issue of disputed fact on this claim for trial, and Defendants are entitled to summary

1    judgment on Plaintiff's Negligence claim as a matter of law.

2    ### 2.  Assault and Battery

3    Plaintiff claims that Defendants "maliciously, intentionally, and unnecessarily shot

4    Plaintiff with rubber bullets and ordered a K9 to attack him while he was unconscious which

5    caused Plaintiff to suffer a traumatic brain injury . . . and to suffer cuts and lacerations to his back

6    and shoulders."  FAC ¶ 60.  The Court finds that as to Horn and Crescini, the officers who

7    allegedly shot the SAGE projectile and ordered the police dog to attack, Plaintiff has presented

8    sufficient evidence to survive summary judgment.  The elements of battery are:  "(1) the defendant

9    intentionally performed an act that resulted in a harmful or offensive contact with the plaintiff's

10   person; (2) plaintiff did not consent to the contact; and (3) the harmful or offensive contact caused

11   injury, damage, loss or harm to plaintiff."  *Brown v. Ransweiler*, 171 Cal. App. 4th 516, 526-27

12   (2009).  Plaintiff must show unreasonable force when alleging battery against a police officer.

13   *See Edson v. City of Anaheim,* 63 Cal. App. 4th 1269, 1272 (1998); see also *Irvine v. City & Cnty.*

14   *of San Francisco*, No. C-00-01293 EDL, 2001 WL 967524, at *9 (N.D. Cal. July 12, 2001)

15   (applying California law and defining unreasonableness as additional element of battery when

16   alleged against a police officer).  Because an officer is privileged to use reasonable force while

17   exercising his duties, a "California–law battery claim is a counterpart to a federal excessive force

18   claim under section 1983."  *Harding v. City & Cnty. of San Francisco*, No. 13-15156, 2015 WL

19   795603, at *3 (9th Cir. Feb. 26, 2015) (internal quotation marks and citations omitted).  However,

20   the qualified immunity doctrine does not apply to California torts against police officers.  *Venegas*

21   *v. Cnty. of Los Angeles,* 153 Cal. App. 4th 1230, 1243 (2007) ("The doctrine of qualified

22   governmental immunity is a federal doctrine that does not extend to state tort claims against

23   government employees.").

24   For the reasons discussed above in the Court's analysis of Plaintiff's Section 1983 claims,

25   the Court finds that there are material issues of fact as to whether Horn and Crescini used

26   excessive force that could amount to battery under California law.

27   As to Defendants' argument that California Government Code § 820.2 or 820.4 immunizes

28   them from suit, the Court is not persuaded that these sections entitle any Defendant to summary

United States District Court
Northern District of California

19

United States District Court
Northern District of California

1  judgment.   Section 820.2 provides that "[e]xcept as otherwise provided by statute, a public

2  employee is not liable for an injury resulting from his act or omission where the act or omission

3  was the result of the exercise of the discretion vested in him, whether or not such discretion be

4  abused."  Cal. Gov't Code § 820.2.  Under Section 820.4, "[a] public employee is not liable for his

5  act or omission, exercising due care, in the execution or enforcement of any law.  Nothing in this

6  section exonerates a public employee from liability for false arrest or false imprisonment."  Cal.

7  Govt Code § 820.4.  Neither of these immunities applies when an officer uses excessive force.

8  *Robinson v. Solano Cnty.*, 278 F.3d 1007, 1016 (9th Cir. 2002) ("California denies immunity to

9  police officers who use excessive force in arresting a suspect.").

10       For the same reasons previously discussed with regard to Hagg, Cardin and Higgins'

11  alleged use of excessive force, the Court finds that Plaintiff has failed to present sufficient

12  evidence for his assault and battery claim against those officers to survive summary judgment.

13  However, as discussed above, a reasonable jury could find that Horn and Crescini used excessive

14  force against Plaintiff, and such a finding would preclude immunity under Sections 820.2 and

15  820.4.  Therefore, the Court DENIES Defendants' motion on Plaintiff's assault and battery claims

16  as to Horn and Crescini and GRANTS the motion as to Hagg, Cardin, and Higgins.

17              **3.   Intentional Infliction of Emotional Distress**

18       Plaintiff's Fifth Cause of Action alleges that the officers acted with reckless disregard for

19  any concern that Plaintiff would suffer emotional distress during the course of the incident.  The

20  elements of the tort of intentional infliction of emotional distress are: "(1) extreme and outrageous

21  conduct by the defendant with the intention of causing, or reckless disregard of the probability of

22  causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and

23  (3) actual and proximate causation of the emotional distress by the defendant's outrageous

24  conduct."  *Davidson v. City of Westminster,* 32 Cal.3d 197, 209 (1982).   Taking all inferences in

25  Plaintiff's favor, Plaintiff has raised disputed issues of fact regarding Horn and Crescini's conduct

26  that preclude entry of summary judgment as a matter of law.  Therefore, the Court GRANTS

27  Defendants' Motion as to Hagg, Cardin, and Higgins, and DENIES the motion as to Horn and

28  Crescini on Plaintiffs Fifth Cause of Action.

### 4. Bane Act Claims

Plaintiff asserts Bane Act (California Civil Code § 52.1) claims against Horn, Crescini, Cardin, Higgins and Hagg for interfering with and attempting to interfere with Plaintiff's exercise and enjoyment of his civil rights through their use of excessive force and "threats, intimidation and coercion."  FAC ¶¶ 47- 50.  California's Bane Act provides a private cause of action against anyone who "interferes by threats, intimidation, or coercion or attempts to interfere by threats intimidation, or coercion, with the exercise or enjoyment by an individual or individuals of rights secured by the Constitution or laws of the United states, or laws and rights secured by the Constitution or laws of California."  Cal. Civil Code § 52.1(a).

Defendants assert that a Fourth Amendment violation for excessive force, standing alone, cannot establish a Bane Act claim, and that the officers are entitled to "discretionary immunity" under California Government Code Sections 820.2 and 820.4.  Mot. at 22.   There is a split of authority in California on whether a Fourth Amendment excessive force or false arrest violation, standing alone, establishes a violation of California Civil Code § 52.1(a).  *Haynes v. City & Cnty. of San Francisco*, No. C 09-0174 PJH, 2010 WL 2991732, at *6 (N.D. Cal. July 28, 2010) (collecting cases).  The Court agrees with the reasoning of the decisions in *Haynes* and *Cole v. Doe 1 thru 2 Officers of City of Emeryville Police Dep't,* 387 F. Supp. 2d 1084, 1103-04 (N.D. Cal. 2005), and finds that the previously-described issues of material fact preclude entry of summary judgment for Defendants on this claim.  Accordingly, Defendants' motion for summary judgment as to Plaintiff's Bane Act claims is DENIED as to Crescini and Horn, and GRANTED as to Hagg, Cardin and Higgins (against whom Plaintiff has not shown a triable issue of fact under any theory).

## V.   CONCLUSION

Based on the foregoing, Defendants' Motion for Summary Judgment is:

1.   GRANTED on Plaintiff's Fourth Amendment claims of excessive force (First Cause of Action) against Defendants Horn, Hagg, Cardin, and Higgins and DENIED on Plaintiff's Fourth Amendment claims as to Crescini;

2.   GRANTED on Plaintiff's *Monell* claims (Second Cause of Action);

United States District Court
Northern District of California

3.     GRANTED on Plaintiff's Bane Act claims (Third Cause of Action) as to Defendants Higgins, Hagg, and Cardin and DENIED as to Defendants Horn and Crescini;

4.     GRANTED on Plaintiff's Negligence claims (Fourth Cause of Action) as to all Defendants;

5.     GRANTED on Plaintiff's Intentional Infliction of Emotional Distress claims (Fifth Cause of Action) as to Defendants Higgins, Hagg and Cardin and DENIED as to Defendants Horn and Crescini; and

6.     GRANTED on Plaintiff's Battery claims (Sixth Cause of Action) against Defendants Higgins, Hagg, and Cardin and DENIED as to Defendants Horn and Crescini.

The Court sets a case management conference for September 24, 2105, at 2:00 p.m. in Courtroom 15, 18th Floor, 450 Golden Gate Avenue, San Francisco.  The Court continues the pretrial filing deadline currently set for September 14, 2015 to September 18, 2015.  All other dates, including the October 5, 2015 pretrial conference and October 13, 2015 trial dates, remain in effect.

**IT IS SO ORDERED.**

Dated:  Ugr\go dgt''36.''4237

_Haywood S. Gill, Jr._

HAYWOOD S. GILLIAM, JR.
United States District Judge